We'll hear the next case in Ray Lehman Brothers. Good morning, may it please the Court, Rick Scarola for the appellants. You have 120 pages of briefs and we have three discreet issues, so I'm going to dive into the middle. Do the best you can. Successorship, that issue. We believe for the Court to sustain and to agree with the trustee on the successor issue, it's clear that you have to allow the trustee to either do one of two things. Either read into the definition of successor, I'm sorry, read into the definition of Shearson in this agreement, the word successor, or else tinker with the binding effect clause and say it also means you get all the benefits, neither of which are what the language of the agreement says. And you have to do that in the face of the history that the word successor was struck from the four or five precedents. They're in the record at pages 471 to 544 of similar, virtually identical deferred compensation agreements at Shearson. And the reason was, Mr. Gineers, who — The plaintiffs certainly accept that LBI is successor to the extent that they put their claims into the LBI proceedings, right? LBI is a successor for purposes of getting the money, but not a successor for purposes of subordination? Is that the argument? Correct. We certainly contend it's a successor. In fact, the trustee argues that it's something else, the same, but I don't think that really goes to Your Honor's point. Yes, LBI is a successor for purposes of this argument. Paragraph 11 at the end of the agreement extends the obligation to successors. It's one of the three places in the agreement where the word successors appears. The other two places where the word appears — Section 11, if your argument is it has to have this language in order to the benefit of, why wouldn't you potentially be taking a position that would say that successors — LBI is also — that there is no successor benefit for LBI in this situation because that language is not in there? If I understand Your Honor, there is no successor benefit for LBI. I'm not sure I heard — No, the employees' errors, I'm saying. In other words, if you're reading Section 11 to say that it doesn't involve benefits,  under the ESEP agreements, that's my question. Because the — Section 11. Because the obligation to pay continues. The employees haven't changed. The employees are the same people. What has changed as to — well, in the Binding Effect Clause — It's an error to the employee. Why would the error to the employee necessarily get the benefit if we're supposed to read Section 11 the way you're suggesting? Because the contract says that expressly. That's the text. The error does succeed to the benefits, whereas the contract does not say that the subordination clause, which — let me refer you to Paragraph 9. Paragraph 9 has two places where the word successor appears. Both of them are clawback clauses relating to Shearson or its successors having a right of clawback. In the next following subparagraph, it's where the subordination provision actually appears, but the word successor is not there. Now, there's a reason for this. Mr. Genier's — and I believe you can look at the Genier's affidavit. It's 347 to 351, especially 350 and 351 of the record. Mr. Genier's was the chief administrative officer. He was the head of the so-called ESEP committee. He's also one of my clients as part of this because senior management in 1985 became part of the plan. He explains in detail what was going on. There was a deep concern about successor entities for reasons having to do with what had happened in the early 80s, mid-80s, and what was happening at the time these individuals were going to put half of their earned income per year for four years into this plan. So he says in so many words — I'm sorry, I didn't mean to interrupt, but he says in so many words, management directed the lawyers to do this. Did they do it as perfectly as I would like? No. I prefer to be clear. Let me just say it again on Section 11 because that's really what I'm focused on. Okay. Isn't it common in contracts all the time for parties to say, this agreement binds both of us and our successors, and that includes obligations and benefits that you don't go through? So essentially, if we read Section 11 the way you're saying, then every time Shearson is mentioned, you have to say, okay, is this an obligation? Shearson's mentioned how many times in that agreement? A hundred. A hundred. Right? Over a hundred? I think that's right. Every time we have to say, okay, is this an obligation? Is this a benefit? And then try to make a determination of whether or not this has some binding effect on a successor. Is that really what is stated by that language? Well, we've covered it in the briefs, but a couple of things. As to the other hundred references, there's no parsing that's needed because there are no ongoing quote-unquote benefits to Shearson to be parsed. It just doesn't work that way. The two places where it matters are the two clawback provisions. But coming back to your point about Paragraph 11, could it be read that way? I would submit that it can't in light of the full context of the rest of what this agreement says and the fact that the word successor was struck from the definition very advisedly in contrast to earlier documents. But if you were to think that that's the right reading, then I'd submit this Court can't take away $270 million of pensions from these people on the ground that it's unambiguously the case that Paragraph 11 has to mean words different from what it says on the page, that you have, as I understand your thought, your drift, Judge Bianco, it is that in Paragraph 11, one should be reading into that the words, the benefits, the continuation, but those words aren't there, whereas standard drafting clauses could be binding both parties. It's not binding one party. If it was only binding one party, successors, then you might have an argument potentially that this only deals with obligations. It's binding both parties. If you're binding both parties, I don't know that you're reading anything in to say that it binds them in every respect with respect to the agreement, not just obligations as opposed to benefits. It binds them to duties. What case do you have that where courts have required this additional language that you're suggesting in order to apply it to benefits in an agreement? That goes to the question of whether or not it's an ambiguity. It's not a case, but as a document as a whole, this agreement reads seamlessly the way that we argue that it reads. If you trace through where the word successors appears, it has meaning and it gives meaning to all of the terms in a way that's logical. If you infer benefits or the kind of extension of all of the rights, benefits, et cetera, just out of the binding effect clause, then you have a whole series of anomalies left. We detail these, I think, at page 37 through 39 of our initial brief, a long footnote. There could be more, but that kind of reading essentially is textually nonsensical because it means beneficiaries and heirs then are deemed to have succeeding really duplicative benefits. That's not a clear, sensible reading of the document as a whole. If you think that that's what was meant or could be what was meant, then I think this is obligated to send us back for discovery and trial as to the construction of an agreement that's ambiguous. I think the worst you can fairly find on this document is that it is ambiguous. The Cass case allows you to look at the Genier's affidavit as the context because the guy who signed it on behalf of the company says, we told the lawyers to have it exclude successors from subordination risk. We said that. You have that in front of you, and that has to be given meaning. You can only not give it meaning if you turn a blind eye to it saying that this agreement is so clearly not what we said that it is, so clearly on the text not what Mr. Genier's says that it's ambiguous and you will not look at what Genier's says, and I think that would be wrong. Thank you. We'll hear from the other side. Good morning, Your Honors. May it please the Court. Jim Fitzpatrick for the Lehman Brothers trustee. Your Honors, Section 510A of the Bankruptcy Code states that subordination agreements are enforceable in bankruptcy to the extent they're enforceable under state law, and the state law here, which both parties agree is New York, would look first to the language of the agreement. If we look at the language of the ESEP agreement, we'd submit that it unambiguously makes clear that these claims are, A, subordinated, B, irrevocably subordinated, and C, that in the event of a SIPA liquidation exactly like this one, the claimants do not recover until the claims of unsubordinated general creditors have been satisfied or provided for. We'd submit there's no ambiguity in any of that language. Even if there were, I will turn to opposing counsel's argument about successorship. First of all, Lehman Brothers, Inc. is not a successor to Shearson Lehman Brothers, Inc. It's the same company. We don't disagree for a second that there were corporate changes that occurred in the 20 or 25 intervening years. There were sales and there were mergers, but as the Bankruptcy Court correctly found, based on the undisputed records from the certified records from the Delaware Secretary of State, when requesting all documents, all filings related to Lehman Brothers, Inc., we get this set of documents that shows that in any merger, either Shearson Lehman Brothers, Inc. at the time or post name change, Lehman Brothers, Inc. was always the surviving entity in any merger. The law is clear that the surviving entity in a merger gets the rights and the obligations of the entities that entered into that merger. Otherwise, what we have is name changes, which everyone agrees are not relevant, except they are legally irrelevant, but what they mean is that when reading the agreement, when Your Honor sees the term Shearson Lehman Brothers, Inc., Your Honor should also read it as Lehman Brothers, Inc., because the name change itself is irrelevant. There were also some... There were also some... In a broad sense, LBI is a successor? I do think there... I do think that colloquially one can say successor. That's true, Your Honor. But I don't think in terms of having any legal effect, it in no way is a successor that inherits the obligations of Shearson Lehman Brothers, Inc., but doesn't... But those obligations somehow change from subordinated to unsubordinated, but I wouldn't dispute that colloquially one will sometimes say successor, Your Honor. But then I'll turn to even if it is a successor, Your Honor. First of all, the law is that a successor corporation inherits the rights and obligations of its predecessor. It's not that it inherits the obligations, but those obligations can somehow change their very nature from subordinated to unsubordinated, and particularly in a case here where you're a broker-dealer and subject to net capital requirements, and there was a very important reason that those claims were subordinated. But even if that... Even if that weren't the case, a successor gets the rights and obligations of its predecessor. Because of that, Your Honors, we'd submit that section of the contract, Section 11, that talks about it being binding on successors is not even necessary, and a lot of contract drafting texts say that. It's not strictly a necessary clause, because contracts are binding on successors. That's what successors are. But here, the drafters removed any doubt, because they made very clear that the contract is binding on both the successors of Shearson and the heirs of the employees. And so, we'd submit that unambiguously, the contract very clearly states that the claims were always subordinated, and it states very explicitly how they are to be handled in a SIPA liquidation like this one, and that's that they are to be subordinated. If I could just turn to one other point. We do take... First of all, we don't... Of course, it's our position that the agreement is clear and that it's not proper to go looking at other deferred compensation agreements. The question can be answered by looking at this one, but we do take issue with the idea that there was this very knowing, careful deletion of the word successor from prior agreements. If your honors do look at those prior agreements, you'll see they have a whole section one that define dozens and dozens of terms that just doesn't appear in the ESAP agreement. So if your honors were, which we would submit you shouldn't, look at extrinsic evidence, it's not as though you've got a clear definition where one can see that the drafters used that as a model and then struck it out. Do you want to address the callback provisions, the differing language in the callback provisions for a moment? The callback provisions. Yes. Your honor, we do admit that those agreements, those sections would read the same way with or without the successor language. I mean, I think that's the only plain reading of the contract, but what it doesn't mean, you can't use the provision, you can't use the doctrine of expressionis to put ambiguity into this agreement where there isn't any to begin with, and that's the NYU case that we cite in our brief. And so it is true that those sections include the word successor and they don't have to. I would note that one of those sections also includes the phrase employee and his heirs and assigns, which you also don't have to because of the section 11. So it's not a drafting error. We're not asking you to read the terms any differently than what they say, but we do acknowledge that the effect would be the same in those two sections whether or not it used the word successors. But that's not a reason to read the other 130 times that Shearson is used in the agreement without successors to only mean Shearson and not successors or maybe mean Shearson and successors if what we're talking about is an obligation of Shearson. If I could just turn briefly to the other point beyond contract interpretation, if, you know, as the lower courts have held, first of all, that the agreements are plain on their face that they do subordinate. And then they turn to the question of whether the claims then become unsubordinated in the event of a material breach of the agreement, whether that be either by Lehman Brothers during the term of the contract or the implied rejection that the implied breach that occurs when the trustee rejects these contracts if they are executory. And as both courts below correctly held, courts enforce provisions of the contract in favor of breaching that benefit breaching parties all the time. We cited cases where that happens with limitations on damages provisions, arbitration clauses, forum selection clauses. And at least one of those cases regarding a forum selection clause, the Court specifically addressed the argument here, which is that there the plaintiff said, well, wait, the defendant breached. They can't enforce the forum selection clause. And the Court said, no, that's not correct. We enforce clauses like that all the time. More directly on point, we also have cases where there were subordination clauses and the plaintiff sued and won, and the Court said, yes, you win, you're entitled to your judgment, but it's still subordinated. The subordination clause doesn't go away just because there is a breach. And in the briefs, there's a, you know, Roman 1, 2, and 3, where there's the contract interpretation, the breach, and rejection. We'd submit that the rejection is really no different than the breach because the case law is very clear that all that rejection is is a breach, and it gives the claimants a claim into the estate, which in this case is subordinated. The rejection cases make clear that the contract doesn't go away or vaporize or disappear. It is a breach. We fully admit that. But for all the same reasons we have in Section 2, that the breach doesn't vitiate the subordination provisions, neither does the rejection, unless Your Honor has any other questions. Thank you. Thank you, Your Honor. Mr. Bottle. Thank you. It's a form of speed dating, I guess, with this many issues. I apologize to go over my time a bit, but Mr. Fitzpatrick made clear that in response to Judge Bianco's question, what do you say about the word successor in the clawback provision? Well, they don't have to be there. That should tell this Court this agreement is at a minimum ambiguous and needs to be before the section on subordination where the words successor don't appear. Now, if you have ambiguity, you need discovery and you need a trial. But before you even get to ambiguity, we briefed, I think it's pages 44, 46 of our main brief, the Cass case under the New York Court of Appeals, I think it applies even in the Federal Court on Construction, says you can consider whether or not something is ambiguous. You can look at the context and that's what Geneers supplies. Some associate at a law firm, Mr. Geneers thinks it was the Wilkie firm, made changes to this agreement. There's a person who went in and struck the word successors in the place where it had appeared in all prior instances, all prior iterations of a virtually identical agreement for similar plans. Some human did that and they did it for a reason. You can't say it is done by happenstance. I don't believe you can fairly conclude that. And if it is not done by happenstance, then you've got to send this back because people shouldn't lose their pensions over trying to jam a square peg in a round hole or is it a brown peg in a square hole, I can't remember. But the language, when you try to parse it, doesn't work. And you don't have to parse 130 references to Shearson because most of them are irrelevant to the question of rights versus burdens. Somebody changed the document because they were told to. Parties had intended that benefits not be subordinated. There would have been many much clearer ways of articulating that and we just don't see that. I submit this to Your Honor. You've seen many agreements that are not perfectly done. In 1985, this is not a $300 million loan deal. It's being done by lawyers outside the reading of investment bankers and Wall Street professionals who were given a general instruction. It's being done by the folks who do employee benefits and deferred compensation agreements and they didn't include all of the language that Your Honor says is missing. But the indicia of what was intended, as Gineers tells you it was intended, is clearly in the agreement because the word was struck from the definition and it was left in in the three places where it mattered. Again, would I have written it differently? Of course. Is it perfect? No. But is it at least not ambiguously what the trustee says it is? It is not unambiguously what the trustee says. I do not believe you can end this case and deprive these people of their pensions in the face of their having discussed this issue, management having discussed this issue, to come out the way we say. By trying to weep. One more quick question. One of the arguments they made in their briefs is that the unsubordination of the employees claims by successors would have had a huge impact on the federal net capital regulations. What's your response to that? That would have been a major thing for the company. What's your response to that? It wouldn't have been a major thing. At different times it would have been a thing. But I mean by the time of the bankruptcy, the size of this plan . . . By the time of the draft, not the time of the bankruptcy, at the time of the drafting for them to have unsubordinated the claims would have been a huge thing for purposes of that regulation. Not really so, because at the time the money was put in, huge money for each individual. Probably I've tried to calculate it, about $30 to $40 million in 1985, over four years. That money grew over the next 25 years, which is how you get to a billion dollars of expectancy cut back to $270 million on the books in the year 2008 at the time of the bankruptcy. But no, it would not have been an earth-shaking thing. It was a benefit . . . Let me take a step back. I know I'm over time, but you asked the question. The way these plans were constructed was it was a profit for Lehman. It wasn't a benefit from Lehman to the employees, although it was a benefit for the employees. It was profitable because up until 1986 tax law changes, when there was a substantial change in the tax law, these plans allowed companies to sponsor the thing, take life insurance policies out on the employees, borrow heavily against them, borrow to the hilt in a tax-advantaged manner. The company effectively had a tax play where it made money through the borrowing on a tax-free basis, as I understand it, on the insurance policies, all while eventually owing some money down the road. By comparison, the effect on the net capital regulations . . . Yes, it was a benefit. These plans were always structured that way, but it wasn't a big needle mover, even at that time. All right. We have your argument. May I touch on the material breach issue? Enough. Thank you. We will reserve a decision.